UNITED STATES of America,
Appellee,

v.

Joseph N. PALLADINO, Joseph N.
Palladino, Jr., Appellants.

No. 72-1005.

United States Court of Appeals,
First Circuit.

Argued Dec. 4, 1972.

Decided Feb. 22, 1973.

Judgment Vacated June 25, 1973.
See 93 S.Ct. 3066.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Defendants, father and son, were convicted jointly by a jury on three counts of a nine-count indictment charging the mailing of obscene matter in violation of 18 U.S.C. § 1461, and were sentenced respectively for four and two years. The critical questions on appeal are whether the materials found obscene are constitutionally protected as a matter of law; whether proof of pandering was admissible, "the crime of pandering" not having been charged; and whether the government was obliged to proffer expert testimony on the three components of obscenity—dominant prurient appeal, patent offensiveness exceeding community standards, and utter lack of redeeming social value. Several other issues of lesser import will be discussed briefly.

The evidence for the prosecution consisted of the materials charged as being obscene, some additional materials evidencing the manner of distribution, testimony by four recipients, including one government agent who ordered books under a false name, and evidence that defendants, through their company, Granite Mail Order House, Inc., had engaged in large-scale mailing operations. The defense evidence consisted of comparative materials which had been found non-obscene by various courts as well as a recent issue of Playboy magazine designed to demonstrate contemporary community standards. The district court directed verdicts of acquittal on three counts which were largely duplicative of others. The jury acquitted on one count charging the mailing of a deck of playing cards illustrating various positions of sexual intercourse and on two counts charging the mailing of advertising circulars.

Herald Price Fahringer, Jr., Buffalo, N. Y., with whom John A. Pino, Boston, Mass., was on brief, for appellants.

Frederic R. Kellogg, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., was on brief, for appellee.

## The Materials

The materials found to be obscene were five books and a mailing consisting

of three brochures.[1] The latter and two other sets of mailed brochures found not obscene evidenced the tenor of the marketing of the books. Each book will be briefly discussed, together with reference to it in the brochures. The three brochures in the mailing found obscene will be described separately.

"A Report on Denmark's Legalized Pornography" is a 560 page, hard cover volume. The first 494 pages consist of 264 pages of interviews on the subject of Denmark's recent scatological equinox; two Gallup polls on the legalization of pornographic books and pictures; two articles in the Danish Review concerning Danish attitudes toward pornography; and a 180 page "Pornography Report of the Penal Code Council". The last 65 pages of the book consist of a collection of advertisements of pornographic materials. The first half of this section is devoted to many small black-and-white advertisements. The second half consists largely of full-page magazine advertisements in color portraying, inter alia, actual sexual intercourse, acts of fellatio, lesbianism, cunnilingus, and group sexual activity by three and four persons. A brochure advertised this book with the lead-off text: "New in America—SEE FOR THE FIRST TIME—THE NO HOLDS BARRED ILLUSTRATIONS from Scandinavian magazines and SEX PERIODICALS—MANY IN FULL COLOR . . . . ORGIES—EVERY SEX NOVELTY about which you have heard whispers . . . ." At the bottom of the advertisement there is reference to "the most important social revolution of our time" and the interviews, articles, and penal code report.

"Scandinavian Pornography" is also a lengthy hard cover book of some four hundred pages. After 110 pages devoted to a history of "The Fanny Hill Case", a subsequent potpourri includes brief sections of "Inside a Porno Shop", "Copenhagen Sex Fair", some thirty pages of Danish and Swedish magazine illustrations, 140 pages of interviews, "Swedish Porno Cartoons", comments by a Danish Supreme Court Justice on proposals to reform the Danish Penal Code concerning pornography, and a Ministry of Justice Report, sixteen pages of covers of magazines which had been banned, and a final thirty-one page section of black and white pictures from a Danish magazine. The photographs, while less explicit than those in the Danish "Report", display genitalia and simulated intercourse, with a sprinkling of sado-masochism, lesbianism, and bestiality. The cartoons run a similar gamut with flagellation added. The blurb in the brochure, after headlining "CANDID ILLUSTRATIONS, NEVER SEEN IN THE U.S.A. BEFORE", and mentioning a report "under the new freedom", reads: "Fantastically detailed sex cartoons [sic] strips, illustrating sado-masochism, lesbianism, shocking eroticism . . . . Drawing depicting a variety of sexual deviations, and strange sex acts . . . Every Sex Act—natural and perverse . . . ."

"Anal and Oral Love" is a two volume, paperback work, running to some 380 pages of text and over 120 illustrations devoted to a historical account of various love practices connoted by its title. The chapters treat in a literate, although undocumented, fashion with sex practices from early man, through the major ancient civilizations, up to Victorian times. The last chapter, an effort to carry the story into the current era, is set in larger type, makes little pretense at scholarship, and consists mainly of supposed

---

1. Count II charged the obscenity and mailing of "A Report on Denmark's Legalized Pornography", "Scandinavian Pornography", and a two volume work, "Anal and Oral Love". Count IV charged the mailing of a paperback book, "Animals as Sex Partners". Count IX covered the mailing of three brochures: an advertisement for "The Photographic Deck of Sexual Love"; an advertisement for, principally, three books—"Sex Tools for Erotic Pleasure", "The Come Freak", and "The Middle-Aged Pervert"; and an advertisement for the magazine "My-O-My" and six other magazines.

case histories of present-day male homosexuals. The illustrations are all drawn from sculpture or graphic art, from ancient to contemporary, and depict a wide variety of anal and oral sexual activity. A sizeable selected bibliography is contained in each volume. "Anal and Oral Love" is advertised in a brochure announcing "Here are the hard ones setting the new pace! They're heavyweight and hard-crusted books that are boldly unique". The blurb describes the work as a "2 volume picture book", and then describes it as "The 'definitive' sexual survey of man's most off-beat sex acts" which "spells out what The Kinsey Report only hinted about!" The advertisement also contains two explicit drawings of fellatio and sodomy.

The fourth work, a paperback book entitled "Animals as Sex Partners" contains 191 pages of text on supposed contemporary case histories narrating experiences in bestiality, with less than a dozen illustrations from artistic works. This is heralded in a full page advertisement as a "Sex Slammer", "an erotic shocker making others tame and childish by comparison!" A lengthy extract of one encounter is reproduced, together with two illustrations.

The brochures advertising these books were enclosed in envelopes to the addressee with no external identification save the name and address of defendants' company. They contained a note to "purchaser" that the material described was not obscene, that minors should not order the material, and that one could have his or her name removed from the mailing list by sending back the mailing.

The mailing charged in Count IX, which was found to be obscene consisted of three brochures. One advertised "The Photographic Deck of Sexual Love", with a number of photographs depicting a man and a woman in various sex positions; the full deck itself was found nonobscene by the jury in acquitting on a different count. A second advertised "My-O-My" magazine on one side, wherein three groups of nude males were photographically portrayed, and covers of six other magazines on the reverse side showing mostly couples in various amorous poses. The most flamboyant brochure advertised on one side "For the Super-Sensual", the book "Sex Tools for Erotic Pleasure", with a photograph, a listing of various sex gadgets under the blurb, "A New High in Orgasms", and some textual descriptions. On the reversed side are advertised, as "a masterpiece of sensuality" "The Come Freak", the revelations of an insatiable woman, with textual examples; and "The Middle-Aged Pervert", characterized as "A Raging Inferno of Sexual Demands!", again accompanied by textual extracts. Also listed are brief descriptions of eight other books including "Inside the Sex Deviate", "Anatomy of Nine Perverts", "The Sexmasters Guidebook", and "The Orgasm Masters".

### Protection as a Matter of Law

Our first task is to address the issue whether, as a matter of law, any of these materials are non-obscene and therefore protected by the First Amendment. The three-fold test of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) and Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), is semantically clear: (1) do the materials, taken as a whole, appeal primarily to prurient interests of the average adult (or, if directed to deviants, to the prurient interests of the intended group, Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966)?; (2) are the materials patently offensive because they affront contemporary community standards relating to sexual matters?;[2] and (3) are the materials utterly

2. We have previously held that in federal prosecutions the referent for such standards is the nation. Excellent Publications, Inc. v. United States, 309 F.2d 362, 365 (1st Cir. 1962). The question whether the standard in a state prosecution is national or local is presently pending decision by the Supreme Court. Miller v. California, —— U.S. ——, 93 S.Ct. 2607, 37 L.Ed.2d —— (1973).

without redeeming social value? We recognize our nondelegable duty to decide, even as against a contrary jury verdict, that a given work is non-obscene, if we are so convinced. Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).

Unfortunately, we are unable to resort to a simple matching exercise as we did in Hunt v. Keriakos, 428 F.2d 606 (1st Cir. 1970), comparing the materials at issue here with similar ones given absolution by the Supreme Court or even by other courts. The comparative materials submitted in evidence by the defendants comprise such magazines as those we found non-obscene in *Hunt, supra,* portraying either women or men, with genital areas exposed, but no action suggested. A film, "Wild Man and Bride", held not obscene in Commonwealth v. Palladino, 1970 Mass.Adv.Sh. 1127, 260 N.E.2d 653, was described by the district court as merely portraying "a nude man and woman cavorting on a bed kissing and caressing", without sexual congress.

Defendants have sought to assist by including in their brief a catalogue of cases in which the Supreme Court, federal courts of appeal, federal district courts, and state appellate courts have held various materials non-obscene. From our reading, we have not been able to identify publications held non-obscene as a matter of law, which, as do most of these here, combine text, often pedantic; photographs and illustrations depicting not only actual copulation but also a range of deviant practices from fellatio and sodomy to bestiality and group orgies; and such merchandising brochures as those before us.[3] Defendants also advance the proposition, said to be substantiated by the cases in their catalogue, "Essentially, any book that deals seriously with the subject of sex, no matter how frankly, must have some redeeming social value . . . . By its sweeping action, the Supreme Court has left us with the inescapable

conclusion that the printed word simply cannot be obscene . . . . The fact that [these publications] may contain illustrations of the subject matter in no way detracts from their redeeming social value."

We confess that we are not certain whether the law presently protects all printed works involving solely textual material. *Compare* Ginzburg v. United States, 383 U.S. 463, 499 n. 3, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966) (Stewart, J., dissenting), *with* Aday v. United States, 388 U.S. 447, 87 S.Ct. 2095, 18 L.Ed.2d 1309 (1967), rev'ing United States v. West Coast News Co., 357 F.2d 855 (6th Cir. 1966). More importantly, we doubt whether a "serious" discussion in print is sufficient in all cases to save a publication which also contains concededly or obviously obscene, unrelated illustrations or photographs. *But see* United States v. 35 MM. Motion Picture Film, 432 F.2d 705 (2d Cir. 1970); United States v. Stewart, 336 F.Supp. 299 (E.D. Pa.1971). Yet we do not here decide whether a part so dominates that whole that the whole may be said to be "utterly" without redeeming social value. Rather, even on the assumption that the books in issue might, if standing alone, not be obscene, we tend to think that all but one of them are the "close cases [where] evidence of pandering may be probative with respect to the nature of the material in question", *Ginzburg, supra,* 383 U.S. at 474, 86 S.Ct. at 949, and which are for the jury to decide, after hearing the proper evidence.

Defendants claim that the indictment failed to charge "the crime of pandering" or the conduct upon which the crime of mailing obscene matter could be based, appealing to the language of the Court in *Ginzburg* that "the prosecution charged the offense in the context of the circumstances of production, sale, and publicity . . . ." 383 U.S. at 465, 86 S.Ct. at 944. Wholly apart from the fact that there is no separate crime of pandering, the indictment in

---

3. We discuss subsequently whether we may properly consider the manner of merchandising.

*Ginzburg* was no more explicit in its pandering aspect than that in this case; indeed, the instant indictment went further than *Ginzburg's* in alleging the mailing of obscene circulars. Defendants cannot claim surprise. The issue was thoroughly aired in pre-trial proceedings and argued constantly during trial. While United States v. Pinkus, 333 F.Supp. 928 (C.D.Cal.1971), did hold for the proposition that pandering must be charged in the indictment, it erroneously stressed the *Ginzburg* language above quoted as implying the presence of pandering language in the indictment. We agree with Judge Frankel that "conduct" tests are not, strictly, elements of obscenity but "only *permissible* kinds of relevant *evidence* which may serve in a close case to tip the balance toward a finding of obscenity" [emphasis in original]. Milky Way Productions, Inc. v. Leary, 305 F.Supp. 288, 294 (S.D.N.Y. 1969) (three-judge court), aff'd, 397 U.S. 98, 90 S.Ct. 817, 25 L.Ed.2d 78 (1970).

■■■ With respect to "A Report on Denmark's Legalized Pornography" and "Scandinavian Pornography", the bulk of each book is informative concerning the issues revolving about sexual freedom and the photographs, though approaching the extreme in explicitness, are not unrelated to the subject being discussed. But, as our above discussion of the advertisements indicates, the books were exploited by defendants, as was "The Housewife's Handbook on Selective Promiscuity" in *Ginzburg*, the purveyors' deliberate emphasis being "the sexually provocative aspects of the work". 383 U.S. at 472, 86 S.Ct. at 948. As for "Animals as Sex Partners", this work seems to have no historical or literary value, consisting of supposed case histories, and in any event was exploited as a "Sex Slammer" and "erotic shocker". We cannot say that they are constitutionally protected as a matter of law. Of the brochures charged by Count IX, one must be non-obscene. Since the jury found "The Photographic Deck of Sexual Love" itself not obscene, it is difficult to see why a partial presentation thereof, consisting simply of sex positions, could be. However, neither the advertisements for the magazines nor the brochure, advertising "Sex Tools for Erotic Pleasure", "The Come Freak", and "The Middle-Aged Pervert", seem to us to have much claim to protection as a matter of law under any one of the *Roth-Memoirs* tests.

■■■ With reference to "Anal and Oral Love", we take a different view, although without any deep sense of certainty. Not having had the benefit of any expert testimony for or against its meeting the *Roth-Memoirs* standards, we are left with the two volumes themselves. They purport to be and are a cohesive and comprehensive account of certain types of age-old sexual conduct, drawing on the literature and art of several countries and epochs. While, for all we know, the dominant theme may be prurient and the discussion may exceed national standards in their offensiveness, we cannot say that it is utterly without redeeming social value any more than was "Fanny Hill". *Memoirs, supra.* We therefore hold that both volumes of "Anal and Oral Love" are non-obscene as a matter of law.

### Sufficiency of the Evidence

By now it should be clear that we feel singularly unequipped to give intelligent review of the jury's implicit findings that the publications charged in Counts II, IV, and IX failed all of the *Roth-Memoirs* tests, in the context in which they were merchandised. No one of the publications could be simply dismissed as "hard core" pornography. To track the Solicitor General's descriptive catalogue in *Ginzburg*, which Mr. Justice Stewart approved, 383 U.S. at 499 n. 3, 86 S.Ct. at 957, the Danish and Scandinavian books do contain "photographs . . . with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and . . . scenes of orgy-like character." They also contain gross comic book drawings of the

same "activities in an exaggerated fashion". But they are part of an elaborate and documented review of social and legal change. The "Sex Tools" brochure and "Animals as Sex Partners" come close to being verbal descriptions of "such activities in a bizarre manner with no attempt whatsoever to afford portrayals of character or situation and with no pretense to literary value". These two publications, however, pose the problem of determining whether there is a dominant theme which appeals to the prurient interest of a deviant sexual group. Indeed, the Danish and Scandinavian books also deal, to a lesser extent, with such deviant practices as fellatio, lesbianism, flagellation, and bestiality. Unlike the situation in *Mishkin, supra,* 383 U.S. at 510, 86 S.Ct. 958, 16 L.Ed.2d 56, there was no proof, beyond the materials themselves, of prurient appeal to any deviant group. *See* n. 7, *infra.*

█ The present case was tried as carefully and competently as an appellate court could wish. The district court, particularly, exercised exceeding care to provide a fair trial and clear instructions. And it cannot be said that the jury, which acquitted on three of six counts presented to it, was undiscriminating. While the defense submitted advance requests for instructions in the event that expert witnesses were used, citing United States v. Klaw, 350 F.2d 155 (2d Cir. 1965), no such experts were offered. One of several grounds for defendants' motion for acquittal at the end of the prosecution's case, not argued in any detail, was the failure to offer expert testimony on dominant prurient appeal, national standards, and redeeming social value. Although it seems unfortunate to change the ground rules after a trial as well run as this one, we have come to the point where, so long as the tests for obscenity remain the present sophisticated triology, we think fundamental fairness, and therefore due process, requires the intervention of experts.[4] If we are mistaken in that conclusion, we have such doubts about our own unassisted ability to give obscenity cases informed judicial review, that we reach the same result through our supervisory power.[5]

█ In saying this we are under no illusion that "experts" will render the process of adjudicating obscenity a completely rational one, at either trial or on appellate review. There will be problems attendant on qualifying experts, difficulty in confining them to testimony within their competence and directed to subordinate factors bearing on the ultimate question, contradictory testimony and confusion, and perhaps much testimonial nonsense. Nevertheless, we think that the several applicable tests can have a chance of being fairly applied only if jurors and judges are exposed to opinions and made to think about whether the "dominant" theme is an appeal to "prurient interests" and, if so, to what

4. Professors Lockhart and McClure came to the same conclusion:

"[I]f the Supreme Court . . . should go beyond hard-core pornography in categorizing the obscene . . . it is hard to see how material could be intelligently appraised for obscenity or how an appellate court could intelligently review obscenity decisions without the evidence of competent critics or experts. We think the admission of such evidence, when proffered by either side in an obscenity case should be made a constitutional requirement." Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn.L.Rev. 5, 99 (1960).

5. We thus follow those federal, United States v. Klaw, 350 F.2d 155 (2d Cir.

1965); United States v. Groner, 475 F.2d 550 (5th Cir. 1972), reargument granted; *see also* Luros v. United States, 389 F.2d 200 (8th Cir. 1969), and state courts, e. g., California (In re Giannini, 69 Cal.2d 563, 72 Cal.Rptr. 655, 446 P.2d 535 (1968); In re Harris, 56 Cal.2d 879, 16 Cal.Rptr. 889, 366 P.2d 305 (1961), vacated and remanded on other grounds, 374 U.S. 499, 83 S.Ct. 1876, 10 L.Ed.2d 1044 (1963)); Maryland (Dunn v. State Board of Censors, 240 Md. 249, 213 A.2d 751 (1965)), which have required expert testimony for either of these reasons. For statutory authorization for expert testimony, *see* Mass. Gen.Laws Ann. ch. 272, § 28F.

groups; whether material is "patently offensive" because it affronts "contemporary" and national standards relating to the description of sexual matters; and whether material is "utterly without redeeming social value".[6] Such matters as prurience, deviant attitudes, national standards of acceptability, and redeeming social value are far removed from the thought and experience of the average jury. Jurors, it seems to us, need assistance in wrestling with such issues fully as much as they need assistance in evaluating an insanity or other mental or emotional illness defense.

The classic argument is set forth in *Klaw, supra.* That court, after rehearsing the multiplicity of questions to be answered, concluded, "Having in mind the constitutional contrictions on the breadth of legislation affecting the freedom of expression, if appeal to prurient interest—on either an 'average man' or a 'deviant typical recipient' basis—is the statutory concern, then it seems desirable, indeed essential, that such appeal to someone be shown to exist." 350 F.2d at 165–166. It then added, "And if proof of prurient stimulation and response is generally important, it is particularly necessary when the prurient interest may be that of a deviant segment of society whose reactions are hardly a matter of common knowledge." *Id.* at 166.[7] The role of the expert would not be to give an opinion "which expresses his legal judgment concerning the dominant theme's appeal to prurient interest, but to provide the trier of fact with a sufficiently full array of professional observations in order to render unlikely a hasty assumption that the publication at issue will affect everyone it reaches in the same way, under all circumstances." Stern, Toward a Rationale for the Use of Expert Testimony in Obscenity Litigation, 20 Case Western L.Rev. 527, 549 (1968).

We also deem experts important, although in varying degree, to guide juries through the other two branches of the *Roth* maze. National standards are, to say the least, elusive beasts. A determination of whether a document exceeds the national level of tolerance requires some exposure not just to publications of national or broad regional scope, but also to the views, attitudes, habits, and tastes of other communities with different climates, cultures, and histories. As the concurrence in *Groner, supra* n. 5, at 72, recognized, a Boston jury, perhaps unfairly sterotyped as puritanical, may well, if left to its own concepts of offensiveness, produce a different verdict on the same manuscript than that of a jury elsewhere. If we are to prevent uneven and hence unequal application of the same federal law, we must have experts to advise the jury, and the no less limited appellate judges, as to the contemporary national standards. In this we agree with Mr. Justice Frankfurter's

6. Two helpful commentaries are Stern, Toward a Rationale for the Use of Expert Testimony in Obscenity Litigation, 20 Case Western L.Rev. 527 (1968) ; Ross, Expert Testimony in Obscenity Cases, 18 Hastings L.J. 161 (1966). *See also* Note, The Use of Expert Testimony in Obscenity Litigation, 195 Wis.L.Rev. 113. Although Ross and Stern disagree as to which elements of the test require expert testimony, in our view the basic rationale requires experts on each element of the criminal concept.

7. The government concedes the viability of *Klaw* for "esoteric" materials aimed at a deviant group, assuming that this case does not involve such. But, as the passages quoted above make clear, the rationale, while "particularly necessary" when the materials are intended for deviants, also applies to appeals to average prurience. We think this case illustrates the unworkability of hinging the requirement for experts to the kind of intended recipients, for most of the materials contain a mixture of "normal" and "deviant" appeals. We note that *Klaw* would not apply to such "hard core" materials as color slides depicting erotic acts, United States v. Wild, 422 F.2d 34 (2 Cir.), cert. denied, 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971). *See also* United States v. Manarite, 448 F.2d 583, 593 (2d Cir.), cert. denied, 404 U.S. 947, 92 S.Ct. 281, 30 L.Ed.2d 264 (1971).

observation in Smith v. California, 361 U.S. 147, 165, 80 S.Ct. 215, 225, 4 L.Ed. 2d 205 (1959) (concurring) that "community standards or the psychological or physiological consequences of questioned literature can as a matter of fact hardly be established except through experts." [8] *See also* Ross, Expert Testimony in Obscenity Cases, 18 Hastings L.J. 161, 174–177 (1966).

 Social value, most particularly, is a subject requiring careful delineation. It is axiomatic First Amendment doctrine that the majority may not prescribe what is valuable expression. Police Dept. of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Thus if we are to prevent the obscenity law's unusual provision for judgment of a publication's value from becoming the passing majority's tool for repressing expression it finds distasteful, unusual, discomforting, or simply threatening, we must have witnesses, with psychological, sociological, medical, historical, or literary expertise, to explain objectively the total absence of redeeming social value. *See generally* Stern, *supra.*

While the required use of experts will not make obscenity decisions easy, they will, we think, make the process of decision a more structured one. In any event, the alternative is, as the court said in *Klaw,* the less acceptable one of *res ipsa loquitur.* The jury in the present case was handed the four books, comprising almost 1500 pages, and the set of brochures, was given an hour's worth of careful instruction, and was expected to rise above its personal preferences and day-to-day experiences, take the national pulse, sense what was not merely shocking to it but prurient to the group or groups being appealed to, and identify any possible redeeming social value. If this seems like being cast loose on a windless sea, appellate courts are in an even less enviable position, for juries at least have, by virtue of their selection, some sense of sharing values with some community. We are completely sympathetic with the court in United States v. Groner, *supra,* at 2284, which said, "Without some guidance from experts or otherwise, we find ourselves unable to apply the Roth standard with anything more definite or objective then our own personal standards of prudence and decency, standards which should not and cannot serve as a basis for either denying or granting first amendment protection to this or any other literature."

 We therefore reverse and remand for retrial. In the light of our discussion of protection as a matter of law, the government may still press the three counts of mailing obscene matter on which the jury convicted the defendants. However, since we hold both volumes of "Anal and Oral Love" protected as a matter of law, and since the jury here necessarily held the advertisement for "The Photographic Deck of Sexual Love" not obscene, the government may not again introduce these materials into evidence to establish the crime of mailing obscene matters.[9] We do not accept the defendant's contention that the government must limit each count to a single document, or alterna-

---

8. He adds the necessary caveat, "Of course the testimony of experts would not displace judge or jury in determining the ultimate question whether the particular book is obscene, any more than the testimony of experts relating to the state of the art in patent suits determines the patentability of a controverted device." 361 U.S. at 165, 80 S.Ct. at 225.

9. Defendants assert that the Supreme Court in Wiener v. California, 404 U.S. 988, 92 S.Ct. 534, 30 L.Ed.2d 539 (1971), found the magazine "My-O-My" not obscene as a matter of law. Since neither the Supreme Court's order nor the summary of the ruling below, 40 U.S.L.W. 3240 (U.S. Nov. 16, 1971), indicate anything in that regard, and the lower court's opinion is not published, we are not sure if this is so. If, however, the defendants could establish at a new trial that this was the ruling, the district court could black out the side of the advertisement dealing with "My-O-My."

tively that if multi-document counts are permitted, the jury must be instructed that it can only convict if all of the documents in a particular mailing are obscene. The offense is the *mailing of obscene material*; hence all matters in a single mailing may be charged in one count and guilt found if any one of them is obscene.

■ Since a retrial is possible, we deem it important to comment on the court's instruction that the jury, in addition to answering the *Roth-Memoirs* trilogy of questions, or as an aid to answering them, should determine whether the Danish and Scandinavian books were "legitimate" publications or whether the written material was "simply the excuse for sale of these most vivid" photographs at the end of the book. The Supreme Court in *Ginzburg* threw some doubt on this kind of approach, absent evidence of pandering. 383 U.S. at 471, 86 S.Ct. 942, 16 L.Ed.2d 31. While the problem of assessing the whole, when the parts are disparate, is a vexing one, it nevertheless seems inconsistent with the prescribed tests, which speak in terms of effect, to ask a jury to speculate on questions of purpose and good faith.

■ A question arising during the trial as to the court's in camera examination of a juror who had indicated his discomfort with the subject matter is now moot. Should such a situation again arise, inquiry should be made in the presence of counsel. United States v. Larkin, 417 F.2d 617 (1st Cir. 1969). Defendant's challenge to the constitutionality of 18 U.S.C. § 1461 on the ground that Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), voids any governmental power to restrict distribution of obscene materials to consenting adults is, for the present at least, foreclosed by United States v. Reidel, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971). All other objections have been considered and are found to be without merit.

Judgment reversed. Case remanded for proceedings consistent with this opinion.

LEVIN H. CAMPBELL, Circuit Judge (concurring).

I would be tempted to follow Judge Aldrich's dissenting views were I not of the opinion that the law, as it now stands, precludes our doing so. However, were I to do so it would be with these qualifications:

I think the most potent objection to the *Roth* test rests on the virtual impossibility of applying it. "Obscenity" or "pornography" is not a word susceptible to close analysis and definition. Essentially they are pejoratives, indicating material which arouses disgust in someone. Unless one is to sanction banning all materials which any substantial body of opinion might regard as disgusting— a position inviting an intolerable degree of censorship in view of the many different standards today prevailing, and one properly rejected by the Supreme Court —one is left with the virtually impossible task of selecting out that which is "really" bad from that which is not quite so bad. Experts may help in bringing about a more sophisticated consideration of the issue, but I agree with Judge Aldrich that they will not meet the problem.

Assuming, then, that we may have to give up the attempt, what then? I think that society should be allowed to regulate somewhat the display and circulation of highly offensive materials although not to ban them. Modern advertising in a market economy is a potent and intrusive force. It would be unfortunate if our society, already dominated by Nielsen ratings and televised fantasies of violence and unreality, should be further dominated by the fantasies of inventive merchants of smut. I think that families are entitled, if the legislature so determines, to a reasonable degree of protection from unsolicited materials, and from the unregulated intrusion by entrepreneurs of pornography in-

to their daily lives through the mails and media, including, at some future time, the omnipresent TV set.

Should the unsatisfactory effort to separate "hard core" from protected materials ever be abandoned, I think that attention might be focused on working out principles permitting reasonable restrictions on the most blatant public advertising and display of pornography. Admittedly the problem of definition would remain: but I think a somewhat looser definition would be permissible since the type of regulation I have in mind would relate only to the more intrusive forms of publicity and would fall considerably short of outright banning. While consenting adults should be free to receive and see what they want, I do not think that society is constitutionally required to surrender all attempt at control over the milieu within which its children are reared.

ALDRICH, Senior Judge (dissenting).

I do not, of course, disagree about children. It is difficult to disagree at all with the decision of the court unless one is to take the stand that hard core pornography is no longer to be considered unlawful. So far as the large scale, colored, and highly focused pictures, and the scenes they portray, in the case at bar are concerned, it is hard to think of what, other than scatological, has been omitted. Nevertheless, I confess that the full freedom advocated by the great majority of its members, *see* Presidential Report of the Commission on Obscenity and Pornography (1970), though said to be "among the most controversial reports ever produced by an official government body," [1] has much to recommend it, not only to avoid sporadic and highly selective enforcement that is cryingly conspicuous, and probably inevitable, but because I believe that public

surfeit will more nearly effect a cure than will any process of judicial sanction.[2] I must wonder, too, not only with the Commission majority, but with that well known nonlibertine Billy Graham,[3] whether pornography is objectionable other than as a matter of aesthetics, and is but a reflection of contemporary behavior rather than a cause. If pornography, privately enjoyed, is not harmful, what is the need for a "redeeming social value"? More important, on what basis is a value judgment to be formed?

If pornography is to be prosecuted it is perhaps more logical to have juries weigh expert opinion than to apply, unaided, their own individual concepts. Yet, having dealt with experts in this field for over three decades, I am not sanguine enough to think that much will be accomplished. Even if any are found qualified to expound a national standard, *cf.* Jacobellis v. Ohio, 1964, 378 U.S. 184, 194–195, 84 S.Ct. 1676, 12 L.Ed.2d 793, how much weight will an average juror attach to the witness' appraisal if it differs from his own? We have insisted upon experts in patent cases, *e.g.*, Contour Saws, Inc. v. L. S. Starrett Co., 1 Cir., 1970, 428 F.2d 314, 319, but that is to fill a conceded void. Will not the average juror, whether assisted or not, still not know anything about art, but know what he doesn't like?

But deeper than the matter of experts, without in any way criticizing the scholarship of the court's opinion, or its legal correctness in the light of judicial precedents, I wonder if we are not deluding ourselves. If a deck of cards illustrating 52 positions of sexual intercourse is not obscene—I reject the thought that the cards have a redeeming social value because of their obverse side—presumably because they are "straight," although we are told that many persons consider positions other than the "mis-

1. Greenleaf Classics, Inc., edition (1970) p. 8, Foreword of D. H. Gilmore.

2. Concededly, public surfeit is not imminent, *see* Sexploitation: Sin's Wages, Newsweek, Feb. 12, 1973, p. 78.

3. Foreword, n. 1, at 11.

sionary" unnatural; if two volumes illustrating oral and anal congress, although these are classic "unnatural" acts, are obscene in the jury's mind, but not in the court's because of their art, or the accompanying text, on what rational basis can one decide whether an "appendix" of 30 pages of graphic photographs of so-called unnatural and other acts is obscene? I resist the temptation to repeat the list of cases favoring the defendant to be found in defendants' brief herein.

Whether publishers of putative pornography are jailed or not has come to be a game of chance[4] played with prosecutors, juries, courts, and finally, with all respect, with the Supreme Court, whose ultimate wisdom permits it to perceive what is hard core and what is not. In the light of the First Amendment protection afforded to any speech falling short of pornographic condemnation, one may envisage the chilling effect that this uncertainty engenders. When, however difficult the boundary was to define, a large area of writing and illustration was considered impermissible, such nubilation had to be tolerated. With the area shrunk to its present proportions, the price seems very high.

Finally, I hope that the pandering rule, except insofar as it serves to protect from affront persons who, understandably, wish to be left alone, will go by the board. Is this to be the one field where seller's talk is forbidden? Is a book any dirtier because the vendor says it is? The concept of a subjective test is reminiscent of the Expurgated Mother Goose, which, with tongue-in-cheek, was advertised as omitting "salacious" words. E.g., "Georgie Porgie, pudding and pie, _____ed the girls and made them cry." Since a reader with "lascivious thoughts," would readily supply, at that time unprintable, words, did this become an obscene book?

Much current pornographic material is, to many, highly offensive. But offensiveness is not the measure of free speech, Cohen v. California, 1971, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284, and centuries of history demonstrate that what is one man's poison is another man's position. I wonder if the time has not come when consenting adults should not only be permitted to read what they choose, Stanley v. Georgia, 1969, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542, but should be free to purchase it. It is true that in United States v. Reidel, 1971, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813, the Court refused to apply *Stanley* to afford rights to a seller, direct or indirect. The opinion suggests to me an unwillingness to consider the readers' rights as a matter of standing. See 402 U.S. at 355–356. The defense of standing has been rapidly eroding. *Compare* Arnold Tours v. Camp, 1970, 400 U.S. 45, 91 S. Ct. 158, 27 L.Ed.2d 179, where it might be said that Court adopted the position which only the minority was willing to take the previous term in Data Processing Service v. Camp, 1970, 397 U.S. 150, 167, 90 S.Ct. 827, 25 L.Ed.2d 184. Defendants in the case at bar, quite apart from their own claims to freedom of speech, would appear to have the same standing to represent the rights of a purchaser as had the defendant in Eisenstadt v. Baird, 1972, 405 U.S. 438, 92 S. Ct. 1029, 31 L.Ed.2d 349. Having milder reservations than my brethren, I would order judgment for the defendants.

4. A risk enabling them to milk the public, as did bootleggers during Prohibition. Op. cit. ante, at 9; *see, also*, n. 2.