150 N.J. Super. 309 (1977)
375 A.2d 1169
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LEONARD DePIANO, DRY AMUSEMENT COMPANY, INC., AND ROBERT OWENS, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 14, 1976.
Decided May 10, 1977.
*311 Before Judges LYNCH, MILMED and ANTELL.
Mr. Robert E. Levy argued the cause for the appellants.
Mr. Benjamin D. Leibowitz, Deputy Attorney General, argued the cause for the respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
*312 PER CURIAM.
A jury found all three defendants guilty of one count of an indictment which charged them with possessing, with intent to sell, obscene materials. Defendant Robert Owens was additionally found guilty of another count of the same indictment which charged him with selling three obscene magazines. Each offense is a misdemeanor under N.J.S.A. 2A:115-2. Defendants' pretrial motions to dismiss the indictment had been denied.
Defendant Leonard DePiano was sentenced to the State Prison for a term of one to three years and a fine of $1,000[1] was imposed upon him. In regard to defendant Owens, the two counts were merged for sentencing and a fine of $750 was imposed upon him. A fine of $1,000 was imposed on the corporate defendant, Dry Amusement Company, Inc.
The State's proofs at trial showed that in 1974 DePiano, president of defendant corporation, applied for and obtained for the corporation a local mercantile license to operate an adult book store at 21 Highway 35 in Neptune Township; that on two occasions prior to November 20, 1974 Investigator Wilmore of the Monmouth County Prosecutor's office observed DePiano in the store working behind the counter; that Wilmore made a purchase from DePiano in the store prior to November 20, 1974, and that on November 20, 1974 Detective Martin, of the Neptune Township Police Department, in the company of Investigator Wilmore, purchased three magazines at the store from Owens. The magazines, costing a total of $28.90, were wrapped in transparent cellophane. They bore the titles: "Teenage Emotions," "Open Sex" and "Loving Hands, Stud No. 5."
At the close of the State's case defendants moved for a dismissal on the ground that the State had failed to prove a prima facie case. The motion was denied. Defendants then rested without presenting any testimony on their behalf and *313 moved for a directed verdict (judgment of acquittal). That motion and defendants' post-conviction motion to set aside the jury verdicts or for a new trial were also denied.
The grounds urged by defendants for vacation of the convictions and sentences and dismissal of the indictment, as set forth in the brief submitted on their behalf, are:

 Point I. Distribution of powers.
 Point II. N.J.S.A. 2A:115-1.1 (1972) cannot be
 construed to include the constitutional
 standards set forth in the most recent
 decisions of the United States Supreme
 Court.
 Point III. N.J.S.A. 2A:115-2 is invalid in that it
 violates Article I, Section 6 of the New
 Jersey State Constitution.
 Point IV. As to defendant-appellant, DePiano, the
 indictment should be dismissed, since no
 supporting evidence of the charges was
 presented to the grand jury.
 Point V. N.J.S.A. 2A:115-2 and N.J.S.A. 2A:115-6
 are in pari materia, must be read and
 construed together, and require dismissal
 of the indictment against
 defendant-appellant, Owens.
 Point VI. Since the indictment fails to charge that
 the defendants had knowledge that the
 publications herein were obscene, it is
 fatally defective and should be dismissed
 as a matter of law.
 Point VII. State failed to meet its burden of proof
 as to contemporary community standards
 and expert testimony.
 Point VIII. Court erroneously submitted the issue of
 obscenity to the jury on a res ipsa
 loquitur approach.
 Point IX. Court failed to accurately charge the
 constituent elements of prurient appeal.
 Point X. Court erred in failing to charge, with
 respect to the appeal to prurient
 interest of deviants.
 Point XI. Objections to charge of the court to the
 jury.

In Points I and II, defendants criticize what they refer to as the "judicial engraftment" on L. 1971, c. 449, by our State Supreme Court in State v. De Santis, 65 N.J. 462 (1974). The object of the criticism undoubtedly is the court's "supplying a stopgap constitutional interpretation" (id. at 472) of the statute, incorporating within it the requirements *314 of Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). In De Santis the court noted that
The history of L. 1971, c. 449 leaves no room for doubt that the Legislature which adopted it intended, as did the enacting body in Welke,[2]supra, 216 N.W.2d at 645, "to proscribe obscenity to the extent consistent with constitutional limitations." See N.J.S.A. 2A:115-1.1; N.J.S.A. 2A:115-1.1a.
[at 473]
The court then concluded:
Pending further legislative action we construe L. 1971, c. 449 in a manner comparable to the construction by the Minnesota Supreme Court in Welke, supra, 216 N.W.2d at 646-647. That construction is referred to earlier in this opinion; it now furnishes adequate notice and warning that "articles and publications which are patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, and patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals" (216 N.W.2d at 646) are embraced within the word "obscene" as used in L. 1971, c. 449. And we now hold that a defendant may be convicted under the statute if the trier of fact finds from the evidence:
(1) "[t]hat the material depicts or describes, in a patently offensive way, sexual conduct as explicated above;
(2) that to the average person, applying contemporary community standards, the dominant theme of the material, taken as a whole, appeals to the prurient interest in such matters; and
(3) that the material, taken as a whole, lacks serious literary, artistic, political, or scientific value." 216 N.W. 2d at 647. [at 473-474]
Defendants' criticism of this interpretation of the statute is both misplaced and misdirected. It is misplaced, since the construction which the court in De Santis gives the statute clearly satisfies "Miller's demand that the prohibited hardcore sexual conduct be `specifically defined by the applicable state law, as written or authoritatively construed.' 413 U.S. at 24, 93 S.Ct. at 2615, 37 L.Ed.2d at 430." State v. De Santis, supra, 65 N.J. at 472 (emphasis *315 supplied). It is misdirected to this court since we are bound by the construction given the statute by our Supreme Court. See Silagy v. State, 105 N.J. Super. 507, 510 (App. Div.), certif. den. 54 N.J. 506 (1969).
Implicit in the De Santis decision is a determination by the court that the Miller requirements do not impinge upon the freedom "of speech or of the press" provisions of our State Constitution, N.J. Const. (1947), Art. I, par. 6. Beyond this,
* * * the Legislature in enacting N.J.S. 2A:115-2 intended to forbid obscene matter to the fullest extent permissible under the First Amendment [of the Federal Constitution], made applicable to the states by the Fourteenth Amendment. [State v. Hudson County News Co., 41 N.J. 247, 265 (1963)]
"* * * Obscenity is not within the area of constitutionally protected speech or press." Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1 L.Ed.2d 1498, 1507 (1957). See also, Miller v. California, supra, where Chief Justice Burger, in his opinion for a majority of the court notes:
This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment. [413 U.S. at 23, 93 S.Ct. at 2614, 37 L.Ed.2d at 430]
We discern no sound reason for cloaking such material with the "liberty of speech or of the press" protection of our State Constitution, as suggested by defendants' Point III.
Defendant DePiano claims (Point 10) that as to him the indictment should be dismissed because the grand jury was not presented with any supporting evidence of the charge that he violated N.J.S.A. 2A:115-2 by possessing, with intent to sell, "certain properties * * * considered as obscene and pornographic in nature and connotation." We disagree. Investigator Wilmore of the Monmouth County Prosecutor's Office testified before the grand jury which returned the indictment. He had before him the three magazines which were purchased at the corporate defendant's adult book store. *316 These publications unquestionably contain patently offensive representations of ultimate sexual acts, masturbation, and lewd exhibition of the genitals, and meet the three-pronged test of De Santis set forth above. Wilmore testified that at the time of purchase DePiano was "the proprietor" of the establishment. There was, accordingly, sufficient evidence upon which to support the charge. In such circumstances, dismissal of the indictment would be improper. State v. Ferrante, 111 N.J. Super. 299, 304 (App. Div. 1970). See also, State v. Weleck, 10 N.J. 355, 364 (1952).
We find no "difference in degree of transgression", State v. Smith, 58 N.J. 202, 207 (1971), of the obscenity laws, N.J.S.A. 2A:115-1 et seq., between the projectionist involved in exhibiting an obscene motion picture show in his employer's theatre on the one hand and the clerk who sells obscene magazines or books in his employer's book store on the other. To this extent, we agree with defendant Owens' claim (Point V) that he is being deprived of the same treatment afforded "a motion picture operator, or assistant operator" under N.J.S.A. 2A:115-6, which reads:
The penalties imposed by the provisions of chapter 115 of Title 2A of the New Jersey Statutes shall not apply to a motion picture operator, or assistant operator, who is employed in a motion picture theatre, in connection with a motion picture show exhibited in said theatre, provided that such operator or assistant operator, has no financial interest in the motion picture theatre wherein he is so employed other than his wages owed and has no decision-making authority or responsibility with respect to the selection of the motion picture show which is exhibited.
However, what this Court recently said in regard to a similar situation in State v. Napriavnik, 147 N.J. Super. 36 (App. Div.), certif. den. 74 N.J. 264 (1977), is equally applicable here. Thus,
* * * we are in no position to offer defendant the relief he seeks. Declaring N.J.S.A. 2A:115-6 unconstitutional as depriving book clerks and similarly situated individuals of equal protection of the laws will not aid defendant; he would still remain liable to prosecution. *317 Moreover, there is no warrant to extend N.J.S.A. 2A:115-6 beyond its clear, express and unequivocal terms by affording its immunity to those the Legislature did not intend to protect. No compelling public need to "judicially salvage" N.J.S.A. 2A:115-6 warrants judicially rewriting this enactment. Compare State v. De Santis, supra. Hence. we conclude that defendant Napriavnik can derive no benefit from the existence of N.J.S.A. 2A:115-6 (or even from a declaration of its unconstitutionality), and his contentions in that regard lack merit. [at 45].
Defendants claim (Point VI) that the indictment should be dismissed because it "does not set forth that [they] had scienter with respect to the character and content of the allegedly obscene materials." We find no merit in the contention. Scienter, an implied element of N.J.S.A. 2A:115-2, State v. Hudson County News Co., 35 N.J. 284, 294 (1961), was sufficiently alleged. The first count of the indictment charges defendant Owens with having "unlawfully and without just cause" sold to Vincent Martin the three named obscene and indecent books, containing lewd, obscene and indecent matters, contrary to N.J.S.A. 2A:115-2. The second count charges all three defendants with having "in their possession and under their control, with intent to sell, certain * * * magazines * * * considered as obscene and pornographic in nature and connotation, contrary to the provisions of N.J.S. 2A:115-2 * * *." As pointed out in State v. Hudson County News Co., 41 N.J. 247 (1963):
Actual knowledge of the contents of the material is not the sine qua non to establish scienter. Otherwise, a bookseller need only close his eyes to the material he handles to avoid prosecution under an obscenity statute. [at 258]
Also, "without just cause" indicates "legislative consideration of matters of knowledge and intent." State v. Hudson County News Co., supra, 35 N.J. at 294. And, intent "presupposes knowledge." Black's Law Dictionary (4 ed. rev., 1968), at 947. See also, Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Here, the purposes of an indictment were sufficiently met, viz., "to *318 enable a defendant to know that against which he must defend; to prevent an accusation in derogation of our interdiction of double jeopardy; and to preclude substitution by a trial jury of an offense for which the grand jury has not indicted." State v. Spano, 128 N.J. Super. 90, 92 (App. Div. 1973), aff'd 64 N.J. 566 (1974).
Defendants argue (Point VII) that "[t]he failure of the prosecution to provide testimony and evidence with respect to contemporary community standards and the introduction of expert testimony [as to the obscenity of the magazines] constitutes a failure on the part of the State of New Jersey to meet its burden of proof"; that the trial judge was in error in submitting the issue of obscenity to the jury without such expert testimony (Point VIII); and that "[a]llowing the mere introduction of the allegedly obscene material into evidence, without expert testimony on the essential elements of obscenity, is a res ipsa loquitur type of approach that is tantamount to a changing of the prosecution's burden of proof to the lower requirement necessary to sustain a civil verdict" (Point VIII). We find no merit in any of these contentions.
In Miller, supra, the court held "that obscenity is to be determined by applying `contemporary community standards,' * * * not `national standards.'" 413 U.S. at 37, 93 S.Ct. at 2622, 37 L.Ed.2d at 438. It pointed out that
When triers of fact are asked to decide whether "the average person, applying contemporary community standards" would consider certain materials "prurient," it would be unrealistic to require that the answer be based on some abstract formulation. The adversary system, with lay jurors as the usual ultimate fact-finders in criminal prosecutions, has historically permitted triers of fact to draw on the standards of their community, guided always by limiting instructions on the law. To require a State to structure obscenity proceedings around evidence of a national "community standard" would be an exercise in futility. [413 U.S. 30, 93 S.Ct. at 2618, 37 L.Ed.2d 434-435]
As we previously noted, in De Santis our State Supreme Court incorporated the Miller requirements into L. 1971, c. *319 449, including the application of "contemporary community standards." 65 N.J. at 472, 474. In the circumstances, we are satisfied that in determining whether material is obscene, local rather than national standards are to be applied. This being so, there is, "as a matter of constitutional law," no need for the State to
* * * produce "expert" witnesses to testify as to the obscenity of the materials * * *. A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a "reasonable" person in other areas of the law. [Hamling v. United States, supra, 418 U.S. at 104-105, 94 S.Ct. at 2901, 41 L.Ed.2d at 613] [Emphasis supplied]
See also, Paris Adult Theatre I v. Slaton, 413 U.S. 49, 56, 93 S.Ct. 2628, 2634, 37 L.Ed.2d 446, 456 (1973); Jenkins v. Georgia, 418 U.S. 153, 157, 94 S.Ct. 2750, 2753, 41 L.Ed. 2d 642, 648 (1974); Note, "Community Standards, Class Actions, And Obscenity Under Miller v. California," 88 Harv. L. Rev. 1838, 1842-1844 (1975).
Here, the trial judge instructed the jury that
The community is the area, the general geographical area in which we find ourselves. * * * You judge the material in evidence by present day standards of the community in which you generally live.

* * *
* * * and you envisage what you deem to be the average person in this contemporary community from which you are drawn * * *.
In light of what we have already said, we find no error in these instructions.
We have considered each of the remaining issues advanced by defendants on this appeal. We find that each of the issues raised is clearly without merit. R. 2:11-3 (e)(2). And see, State v. Napriavnik, supra.
Affirmed.
ANTELL, J.A.D. (dissenting).
I respectfully dissent from the opinion of the court based upon my belief that *320 (1) national, not local, standards apply in determining whether, to the average man, the work, taken as a whole, appeals to prurient interest, and (2) that expert testimony should be required of the prosecution to establish the obscene character of the material and its nonprotected status under the First Amendment to the Constitution of the United States.

I. NATIONAL OR "LOCAL" STANDARDS.
In State v. Hudson County News Co., 41 N.J. 247 (1963), our Supreme Court addressed itself to the question of whether the "contemporary community standards" adverted to in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), were those which prevailed in the nation at large or those of the community where the material was distributed. It resolved the issue in the following words:
Accordingly, we hold that the contemporary community standard to be applied under our statute is not the standard of a particular individual, group of individuals, or locality, but it is the standard of the contemporary society of this country at large. [41 N.J. at 266]
Earlier it had stated:
We are of the opinion that such a standard must necessarily be uniform throughout the nation. [at 265]
The court explained this result in the following language:
The First Amendment protects an area of free expression which cannot be diminished by obscenity regulation. Therefore, the standard to be applied under such regulations cannot operate in such a way as to alter the degree of protection from locality to locality. In short, the area of expression entitled to constitutional protection cannot be broad in some parts of the country and narrow in others. If a publication comes within the protected area, it cannot be suppressed any place where the First Amendment guarantee is in effect. [at 265-266]
*321 This choice was freely arrived at before Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964). In fact, Jacobellis (at 195, 84 S.Ct. 1676) footnotes Hudson County News Co. as precedent for the adoption of a national standard.
I do not agree that the foregoing principle has been abrogated in New Jersey by Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), or State v. De Santis, 65 N.J. 462 (1974). Miller held only that national standards do not apply as a matter of federal constitutional necessity[1] and left the selection of standards to be made by the states. The following commentary by Justice Rehnquist, writing on this issue for an undivided court, in Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974), makes this clear:
We agree with the Supreme Court of Georgia's implicit ruling that the Constitution does not require that juries be instructed in state obscenity cases to apply the standards of a hypothetical state-wide community. Miller approved the use of such instructions; it did not mandate their use. What Miller makes clear is that state juries need not be instructed to apply "national standards." [at 157, 94 S.Ct. at 2753] *322 Indeed, the position of the Supreme Court of the United States is that the states may "drop all controls on commercialized obscenity, if that is what they prefer." Paris Adult Theatre I v. Slaton, 413 U.S. 49, 64, 93 S.Ct. 2628, 2639, 37 L.Ed. 2d 446 (1973).
State v. De Santis, supra, was decided following the modification of the three-pronged obscenity test in Miller v. California, supra. Under Miller a finding of obscenity is made to turn on (1) whether the average person applying contemporary community standards would find that the work taken as a whole appeals to the prurient interest; (2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (3) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value. The sole purpose for which the De Santis appeal was certified was to determine
(1) whether the principles newly announced by the Supreme Court in Miller and the related cases may properly be incorporated into our obscenity statutes so as to sustain their constitutionality and (2) whether they may fairly be incorporated retroactively so as to sustain the convictions of the defendants here. [De Santis, supra, 65 N.J. at 464 emphasis supplied]
The decision centers on the fact that the New Jersey statute failed the Miller test in that it did not specifically define the sexual conduct which could not be depicted in a patently offensive way. Thus, it was held that this requirement could not be retroactively satisfied in order to sustain defendant's conviction since he had not been given "fair notice and due warning." De Santis, supra at 472. However, it concluded that it could salvage the constitutionality of the statute for the purpose of future cases by construing the enactment as though it contained the necessary specification. The opinion is preoccupied with these issues alone. The question of state or national standards is not mentioned or even remotely suggested. As the court expressly stated, its concern was with incorporating the Miller requirements into *323 our statutes "so as to sustain their constitutionality," and under no reading of Miller did a substitution of local for national standards become necessary to sustain the statute's constitutionality.
The only support noted by the majority for its reading of De Santis seems to be the fact that the De Santis opinion (at 474) uses the term "contemporary community standards" in summarizing the three-fold constitutional test of obscenity without differentiating these from "`contemporary community standards,' * * * not `national standards'" in the Miller sense, 413 U.S. at 37, 93 S.Ct. at 2622. Thus, by clipping and pasting together words taken from different contexts the implication is evoked that the latter are to prevail. I cannot agree that in this covert fashion the court meant to signal such a radical change in the course of important constitutional policy it charted so deliberately in State v. Hudson News Co., supra.
Nor can the majority's interpretation of De Santis rest upon the rationale that the De Santis court was responding to the legislative desire that the distribution of obscene materials be restricted to the extent constitutionally permissible. The references to this consideration at pages 466 and 473 of that opinion had only to do with reading the Miller requirement for specificity into the statute for its prospective operation. Furthermore, there is no reason to believe that national standards of decency are any more or less restrictive than those prevailing in New Jersey or its political subdivisions.
Assuming that the majority has correctly prophesied the New Jersey Supreme Court's determination to substitute "local" standards for national, this judgment by itself leaves us with no guidance as to whether the locality is to be that of the entire State, the individual county, or the municipality where the offense is alleged to have occurred. If De Santis did, as the majority says, substitute local for national standards, surely nowhere did it prefigure which of these alternatives are to govern. The instructions given to the jury in this *324 case are not altogether clear on this point, but in directing its attention to "this contemporary community from which you are drawn" the trial judge could well be understood to be referring to the county in which the trial was being conducted. See N.J.S.A. 2A:69-1.
Reconsideration of a doctrine formulated by our Supreme Court in light of later developments in a given field of law is for the Supreme Court alone and not the Superior Court. Franco v. Davis, 51 N.J. 237, 238 (1968). As an intermediate appellate court we are bound to comply with the law established by the Supreme Court. State v. Hill, 139 N.J. Super. 548, 551 (App. Div. 1976). In the face of an authoritative precedent to the contrary this court now holds that conduct which is criminal in one part of the State may be noncriminal in another, and that material protected by the First Amendment in one locality may not be protected in another. In effect we have created conditions whereby standards of prurient appeal and patent offensiveness prevailing in one region may well place a chill upon the distribution of reading matter throughout the State, and in which law enforcement authority will be encouraged to find a forum for obscenity prosecutions which is not only most congenial, but in which predominant subjective value judgments will determine the criminal or noncriminal character of the questioned conduct. As pointed out elsewhere, a single distributor may now be answerable to successive or simultaneous prosecutions in different localities based upon variant standards prevailing in each. Edelstein and Mott, "Collateral Problems in Obscenity Regulation," 7 Seton Hall L.R. 543, 570 (Spring 1976). These are all consequences of momentous import to the right of free speech, and if this Balkanization of so small a geographic area must occur it should at least await the sponsorship of our highest court.

II. EXPERT TESTIMONY.
More is involved here than just deciding the case presented. For my own part I would be content to have the *325 odious subject matter of this appeal suppressed. However, the principles which we apply in doing so must also be applied to test the obscene content of other publications as well, and under the criteria sanctioned by the majority many serious and possibly valuable written and representational efforts could also be deprived of First Amendment protection. It is this contingency which troubles me more than the unpleasantness of allowing these defendants a new trial. Obviously, some degree of objectivity must be brought into the resolution of obscenity litigation. While not a panacea, the required use of expert testimony is minimally necessary as a means of rationally applying the Miller standards and bringing a semblance of order to the present chaos.
The material before us is nauseating. I cannot imagine how it can be thought otherwise by anyone moved by the slightest concern for human dignity. Despite the fact that the sexually explicit photographs contained in these magazines are presented within a setting of pretentious text material, no one can doubt that these publications were never intended for their serious literary, artistic, scientific or political value. Perhaps I am missing something, but none is evident to me. At the same time I also feel, and with equal fervor, that the reeking effluent from these pages could not have the slightest effect upon the prurient interest of the "average person" other than possibly to render it forever quiescent.
Now this is how I analyze these exhibits. These are my opinions. And I am sure they are neither more sincerely nor more firmly held than those of Dr. Bowdler, for example, who, in editing the "Family Shakespeare" undertook to eliminate from those works "whatever is unfit to be read aloud by a gentlemen in the company of ladies." Downs, The First Freedom 15 (1960), or those of Mark Twain who counseled his sweetheart to avoid Gulliver's Travels and Don Quixote so that she might remain "untainted, untouched even by the impure thoughts of others." The latter author, it seems, also fulminated in his journal that a Venus by *326 Titian at the Louvre was "bestial" and "grossly obscene." Kaplan, Mr. Clemens and Mark Twain 93, 21, 268 (1966). Still, he was not above entertaining the Stomach Club in Paris with "Some Thoughts on the Science of Onanism," and between finishing Tom Sawyer and starting Huckleberry Finn he authored the ribald satire "Conversation, As It Was by the Social Fireside in the Time of the Tudors." Kronhausen, Pornography and the Law 42-44 (1959). He must have felt it a great injustice when, in commenting on Huckleberry Finn, no less, Louisa May Alcott said: "If Mr. Clemens cannot think of something better to tell our pureminded lads and lasses, he had better stop writing for them."
Opinions in this field tend to be somewhat variable, something to which the courts themselves have not been particularly resistant. In one carefully considered opinion, the Maryland Court of Appeals concluded that the publication of a cartoon showing a judge masturbating was not obscene. Dillingham v. State, 9 Md. App. 669, 267 A.2d 777 (1970). The Supreme Judicial Court of Massachusetts in Attorney General v. Book Named "God's Little Acre," 326 Mass. 281, 93 N.E.2d 819 (1950), held that Erskine Caldwell's well known work was obscene. The Supreme Court of Georgia in a 4-3 vote found "Carnal Knowledge," an award winning motion picture of 1971, to be obscene, thus affirming the judgment of a jury. Jenkins v. State, 230 Ga. 726, 199 S.E.2d 183 (1973). The Supreme Court of the United States felt otherwise, however, notwithstanding the appearance of nude scenes and scenes depicting "ultimate sexual acts." Since it "could not be found under the Miller standards to depict sexual conduct in a patently offensive way," it reversed the state court action without dissent. Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974).
Of course, by federal constitutional standards "Expert testimony is not necessary to enable the jury to judge the obscenity of material which, as here, has been placed into evidence." Hamling v. United States, 418 U.S. 87, 100, *327 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974); Kaplan v. California, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 56, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). But opinions of the United States Supreme Court go no further than to define the area in which the states "may chart their own course in dealing with obscene materials." Paris Adult Theatre I, supra, at 54, 93 S.Ct. at 2633, and our own Supreme Court has said that states are free to afford greater protections than those provided by the Federal Constitution. State v. Kleinwaks, 68 N.J. 328, 334 (1975).
The attraction is great to resolve this dilemma on the hypothesis that ordinary judges and jurors, uninformed by experts, instinctively know how to apply the Miller standards. But this is a fiction, and it should not be necessary to elaborate on the dangers involved in satisfying constitutional mandates by recourse to fictions. We deal with a test formulated to protect First Amendment values, and although the Supreme Court of the United States has indicated its willingness to accept a quality of proof in satisfaction thereof which would seem to defeat the purpose of the test, this invitation, if such it is, should not be accepted. We, too, are charged with responsibility for preserving the United States Constitution, and the benefits of resolving this problem on a faulty premise do not correspond to what would be endangered in terms of First Amendment freedoms.
Obviously, the publications in question are the product of a milieu experiencing a rapid transition in its standards of allowable sexual expression and in its tolerance for erotic stimulation. Furthermore, eroticism, vulgarity, nudity and lewdness  the raw materials of obscenity  have from time immemorial found their way into the content of serious art and writing for legitimate aesthetic purposes. Not uncommonly they are even deliberately structured to achieve their overall effect by offending the sensibilities of the reader or viewer. With these considerations in mind, it *328 must be evident that where the judgment of obscenity vel non, a relative one involving issues of degree, must be made against volatile community norms, the fine lines which calibrate the passage from what is merely repellent to what is actually obscene can never be distinct. Under these circumstances particular care must be taken to protect against arbitrary censorship and to reduce the probability that material which actually meets functioning standards of public acceptance will be singled out for police action. "The community cannot," after all, "where liberty of speech and press are at issue, condemn that which it generally tolerates." Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (Harlan, J., concurring in part and dissenting in part).
The point is that without objective standards the process of testing obscene content amounts to little more than how the matter in question "happens to strike the minds of jurors or judges," Jacobellis v. Ohio, supra, 378 U.S. at 204, 84 S.Ct. at 1686 (Harlan, J., dissenting), and appellate review comes down to one set of instincts reviewing the work of another. Great as the temptation may be to be done once and for all with this whole business of obscenity, it is the duty of the courts, first and foremost, to persevere in the quest for clearly defined standards by which criminal conduct may be ascertained. Cf. State v. Lair, 62 N.J. 388, 393 (1973). Therefore, I am unwilling to leave the administration of obscenity laws to the vagaries of arbitrary human impulses. Dealing with a concept itself so fugacious that it "may be indefinable," Jacobellis v. Ohio, supra, 378 U.S. at 197, 84 S.Ct. 1676 (Stewart, J., concurring), the urgency is that much greater to insist on evidentiary safeguards that compensate to some degree for the uncertainty of the law. While the required use of expert witnesses will not settle all the problems left in the wake of Miller, it is the only avenue by which the task of identifying obscene material may be approached consistently with basic principles of criminal justice.
*329 Cases in the United States which have considered the question of whether such evidence should be required as a matter of sound substantive practice appear to be evenly divided. Those holding the negative position are well exemplified by United States v. Groner, 479 F.2d 577 (5 Cir.), vacated on other grounds, 414 U.S. 969, 94 S.Ct. 278, 38 L.Ed.2d 213 (1973); United States v. Wild, 422 F.2d 34 (2d Cir.1969), cert. den. 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971); Kahm v. United States, 300 F.2d 78 (5 Cir.), cert. den. 396 U.S. 859, 82 S.Ct. 949, 8 L.Ed.2d 18 (1962); State v. Amato, 49 Wisc.2d 638, 183 N.W.2d 29 (1971), cert. den. 404 U.S. 1063, 92 S.Ct. 735, 30 L.Ed.2d 75 (1972). The logic of these cases finds its ultimate expression in the following language of Paris Adult Theatre I, supra:
This is not a subject that lends itself to the traditional use of expert testimony. Such testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand. Cf. 2 J. Wigmore, Evidence, §§ 556 (3d ed.) (1940). No such assistance is needed by jurors in obscenity cases; indeed, the "expert witness" practices employed in these cases have often made a mockery out of the otherwise sound concept of expert testimony. [cases omitted] "Simply stated, hard core pornography ... can and does speak for itself." [cases omitted]. [413 U.S. at 56 n. 6, 93 S.Ct. at 2634]
Reliance has also been placed upon an analogy to the application by juries of the reasonable man standard. Kahm v. United States, supra at 84. Given as a reason, too, for not requiring expert testimony has been the problem of qualifications. Note, "The Use of Expert Testimony in Obscenity Litigation," 1965 Wisc. L. Rev. 113, 122-124 (1965). It has also been suggested that such evidence would in any case be irrelevant since jurors would not be guided by opinions which run counter to their own moral values. McGaffey, A Realistic Look At Expert Witnesses in Obscenity Cases. 69 Nw. U.L. Rev. 218 (1974).
*330 Finally, the jury, as Judge Ainsworth said in his concurring opinion in United States v. Groner, supra:
* * * which is drawn from a cross section of the community embodies the average or reasonable man and that collective group is as capable as any other of making the critical determination necessary under proper instructions from the trial judge. [479 F.2d at 587]
These responses have the virtue of simplicity, but they serve to obscure rather than resolve an intricate problem. Certainly one knows when he is outraged, but the Miller test requires the making of more sophisticated judgments than this. It is not enough that the material be patently offensive; it must also have prurient appeal. United States v. Klaw, 350 F.2d 155, 167 (2 Cir.1965). I have read many opinions in which reviewing courts denounce the material before them with a torrent of epithets, viz., "vile, filthy, disgusting, vulgar, and, on the whole, quite uninteresting," United States v. Groner, supra at 584, but few where the court concerned itself, as it did in Dillingham v. State, supra, with whether the material radiated an aphrodisiacal effect. This is hardly surprising. How can a publication be both "offensive" and have "appeal" at the same time? Perhaps one with specialized knowledge could explain how to recognize when these contradictory reactions may coincide, but without such assistance I do not understand how this can be done by the ordinary lay person.
And yet, the full complexity of the Miller test cannot be fully appreciated until one realizes that these evaluations must be made, not through the eye of the beholder, the one who is supposed to "know it when he sees it," but through the eye of the "average" man applying contemporary "community" standards.
The fallacy that obscenity determinations can be responsibly made by judges and juries without the special knowledge and insights that experts can provide is nowhere better demonstrated than in the experience of the United States *331 Supreme Court with this subject following Miller v. California, supra.
At the time of their formulation the three criteria of "prurient appeal," "patent offensiveness" and "serious value" were described in Miller, supra, 413 U.S. at 29, 93 S.Ct. 2607, as "concrete guidelines" for courts and juries, by virtue of which the court would thereafter be able to abandon the "casual practice" begun in Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967). The practice consisted of reviewing in each case the fact question of whether obscenity had been proved under standards basically similar to those cited above.[2] That the Redrup procedure is yet to linger despite Miller's "concrete guidelines" was demonstrated in Jenkins v. Georgia, supra, where the Supreme Court reversed a 4-3 affirmance by the Supreme Court of Georgia of an obscenity conviction based on a showing of the nationally acclaimed film, "Carnal Knowledge," which contained nude scenes and an episode of sexual intercourse. In his concurring opinion Justice Brennan reminded the court that the necessity to review the constitutional fact of obscenity would remain as the inevitable result of the subjective Miller test, something he had earlier forecast in his dissent in Paris Adult Theatre I v. Slaton, supra. Noting, in effect, that Miller vested the trial judge and jury with virtually autonomous authority to adjudge material obscene, he added that "`one cannot say with certainty that material is obscene until at least five members of this Court, applying inevitably obscure standards, have pronounced it so.'" 418 U.S. at 164, 94 S.Ct. at 2757.
That the problem of providing appellate review in obscenity cases is made more acute by the United States Supreme *332 Court's ruling obviating expert witnesses has been noted by at least one commentator, "The Supreme Court, 1972 Term," supra at 168 n. 53, and the chilling effect upon freedom of speech and press of ad hoc standards under which all sexually explicit publications are prima facie obscene should not be disregarded. They permit no way of knowing how a jury arrives at its determinations of "average man," "community standards," "prurient appeal," "patent offensiveness" and lack of "serious value," and the verdict of a jury in one case furnishes no guidance whatever as to what may be fit for distribution in the future.
Cases requiring the production of expert testimony are powered by the same basic reasoning expressed by Justice Black in his dissent in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966). There he wrote:
It seems quite apparent to me that human beings, serving either as judges or jurors, could not be expected to give any sort of decision on this element which would even remotely promise any kind of uniformity in the enforcement of this law. What conclusion an individual, be he judge or juror, would reach about whether the material appeals to "prurient interest in sex" would depend largely in the long run not upon testimony of witnesses such as can be given in ordinary criminal cases where conduct is under scrutiny, but would depend to a large extent upon the judge's or juror's personality, habits, inclinations, attitudes and other individual characteristics. In one community or in one courthouse a matter would be condemned as obscene under this so-called criterion but in another community, maybe only a few miles away, or in another courthouse in the same community, the material could be given a clean bill of health. In the final analysis the submission of such an issue as this to a judge or jury amounts to practically nothing more than a request for the judge or juror to assert his own personal beliefs about whether the matter should be allowed to be legally distributed. Upon this subjective determination the law becomes certain for the first and last time. [at 478-479, 86 S.Ct. at 951.]
In United States v. Palladino, 475 F.2d 65 (1 Cir.) vacated 413 U.S. 916, 93 S.Ct. 3066, 37 L.Ed.2d 1038 (1973), the court frankly recognized that experts would not by themselves render the process of adjudicating obscenity *333 a completely rational one. Still, it concluded that expert witnesses were needed to show the obscenity of the material under the "Roth-Memoirs" standards upon the following reasoned exposition:
One of several grounds for defendants' motion for acquittal at the end of the prosecution's case, not argued in any detail, was the failure to offer expert testimony on dominant prurient appeal, national standards, and redeeming social value. Although it seems unfortunate to change the ground rules after a trial as well run as this one, we have come to the point where, so long as the tests for obscenity remain the present sophisticated triology, we think fundamental fairness, and therefore due process, requires the intervention of experts. If we are mistaken in that conclusion, we have such doubts about our own unassisted ability to give obscenity cases informed judicial review, that we reach the same result through our supervisory power. * * * we think that the several applicable tests can have a chance of being fairly applied only if jurors and judges are exposed to opinions and made to think about whether the "dominant" theme is an appeal to "prurient interests" and, if so, to what groups; whether material is "patently offensive" because it affronts "contemporary" and national standards relating to the description of sexual matters; and whether material is "utterly without redeeming social value". Such matters as prurience, deviant attitudes, national standards of acceptability, and redeeming social value are far removed from the thought and experience of the average jury. Jurors, it seems to us, need assistance in wrestling with such issues fully as much as they need assistance in evaluating an insanity or other mental or emotional illness defense.
The classic argument is set forth in Klaw, supra. That court, after rehearsing the multiplicity of questions to be answered, concluded, "Having in mind the constitutional constrictions [sic] on the breadth of legislation affecting the freedom of expression, if appeal to prurient interest-on either an `average man' or a `deviant typical recipient' basis  is the statutory concern, then it seems desirable, indeed essential, that such appeal to someone be shown to exist." 350 F.2d at 165-166. It then added, "And if proof of prurient stimulation and response is generally important, it is particularly necessary when the prurient interest may be that of a deviant segment of society whose reactions are hardly a matter of common knowledge." Id. at 166. The role of the expert would not be to give an opinion "which expresses his legal judgment concerning the dominant theme's appeal to prurient interest, but to provide the trier of fact with a sufficiently full array of professional observations in order to render unlikely a hasty assumption that the publication at issue will affect everyone it reaches in the same way, under all *334 circumstances." Stern, Toward a Rationale for the Use of Expert Testimony in Obscenity Litigation, 20 Case Western L. Rev. 527, 549 (1968).
We also deem experts important, although in varying degree, to guide juries through the other two branches of the Roth maze. National standards are, to say the least, elusive beasts. A determination of whether a document exceeds the national level of tolerance requires some exposure not just to publications of national or broad regional scope, but also to the views, attitudes, habits, and tastes of other communities with different climates, cultures, and histories. As the concurrence in Groner, supra n. 5, at 72, recognized, a Boston Jury, perhaps unfairly sterrotyped as puritanical, may well, if left to its own concepts of offensiveness, produce a different verdict on the same manuscript than that of a jury elsewhere. If we are to prevent uneven and hence unequal application of the same federal law, we must have experts to advise the jury, and the no less limited appellate judges, as to the contemporary national standards. [at 72-73; footnotes omitted]
It should be noted that upon later remand for reconsideration by a 5-4 vote of the Supreme Court this holding was altered "in light of Paris Adult Theatre I v. Slaton," United States v. Palladino, 490 F.2d 499, 503 (1 Cir.1974), an understandable action in light of the preferences expressed by the Supreme Court in Paris. Nevertheless, the foregoing opinion merits acceptance in our jurisdiction for its soundly reasoned substantive principles. To the same effect, see United States v. Klaw, supra at 167; In re Giannini, 69 Cal.2d 563, 72 Cal. Rptr. 655, 446 P.2d 535, 543 (Sup. Ct. 1968); Dunn v. State Board of Censors, 240 Md. 249, 213 A.2d 751, 754 (Ct. App. 1965); Comment, "Expert Testimony in Obscenity Cases," 18 Hastings L.J. 161, 174-177 (1966).
In New Jersey, where the question was squarely considered the conclusion was reached that expert testimony was required for the proof of all three tests of obscenity. Keuper v. Wilson, 111 N.J. Super. 489 (Ch. Div. 1970). The immediately observable ramifications of this rule favor its retention. For one thing, it imposes upon prosecuting authorities the necessity of consulting somewhere along the line with competent advisors to determine whether the evidence satisfies minimal objective criteria of obscenity. This provides *335 some protection against groundless and arbitrary prosecutions.
For the benefit of the trial judge the rule offers a means of creating in the individual case a rational yardstick by which to determine whether a basis exists in the evidence for jury determination. If the case reaches the jury, the expert testimony will make available a reasoning process to apply to the evidence and reduce the role played by the individual juror's personal tastes and biases. At least an attempt will be made to teach them how to identify in a systematic way serious literary, artistic, scientific and political effort, to ponder these, to classify the information received, and to give it weight and consideration relative to those features of the material claimed to be obscene. For the purpose of appellate review it will insure that the record will contain some indication of the standards applied by the jurors so that a reviewing court may assess their rationality and their relationship to First Amendment protections, and test the jury's determination.
Most importantly, it will have the salutary effect of pervasively enlightening the proceedings, of informing them, of bringing to them critical techniques vital to the analysis of a book or a picture to the end, as the court observed in Palladino, supra, that the participants at all levels of the system will be made to think, and not just to react. Thus, the process will more nearly conform to traditional judicial standards and will at least enhance the promise of greater uniformity in enforcement.
In my view, no ordinary person, whether judge or juror, is qualified to make the difficult judgments which these cases require. The material does not speak for itself under Miller standards, and must be shown to be obscene, no less so than innocuous powder must be shown to contain a narcotic under the Controlled Dangerous Substances Act, N.J.S.A. 24:21-1 et seq., and scraps of paper containing numbers must be shown to be lottery papers in prosecutions under the Lottery Act, N.J.S.A. 2A:121-1 et seq.
*336 The truth of Chief Justice Burger's characterization of a "national community standard" as part of an "exercise in futility" is only slightly less applicable to a state community standard, especially with respect to an area as variegated in so many ways as New Jersey is. It is as synthetic a proposition to say that ordinary jurors are qualified to perceive these standards as it would be to say they are competent to discern national standards. Their assessment could be based on nothing beyond the narrow limits of their personal experience.
For the same reasons I am unable to join in the view that the ordinary judge or juror is qualified to discern the responses of the "average man." The term itself implies a blending of many characteristics: health, age, economic status, marital state, education, religious training, occupational background, to name a few. Facile comparisons with the "reasonable man" fail here. The latter is a standard of conduct, i.e., what the ordinarily prudent person would have done under given circumstances. But this process of analysis does not lend itself to determining how an average man would respond to given sexual stimuli, particularly where, as here, some of the material appears to be directed to a "bizarre, deviant group," a species of publication which the Supreme Court has expressly refrained from deciding does not require the production of specialized opinion evidence to prove the material's prurient appeal. Paris Adult Theatre I, supra, 413 U.S. at 56, n. 6, 93 S.Ct. 2628; Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966). Furthermore, in reconstructing the "reasonable man" the juror is free to draw upon his own experience and arrive at this standard by an exchange of views with his fellow jurors. The "average man," however, is a statistical concept which cannot be developed on the basis of a jury's personal collective experience. Finally, as Chief Justice Warren wrote, dissenting, in Jacobellis v. Ohio, supra, 378 U.S. at 199, 84 S.Ct. at 1684, indefinite concepts suitable to the field of negligence are unworkable within the obscenity context *337 since it "involves the area of public expression, an area in which a broad range of freedom is vital to our society and is constitutionally protected."
On the question of "serious value," at the risk of seeming elitist I must state that expert testimony is plainly mandatory. The application of literary, artistic, scientific or political standards so as to say that a work lacks serious value is an undertaking which involves disciplines outside the competence of the ordinary person almost as a matter of definition.
It is unreasonable to expect that people of ordinary understanding are competent to say that even the most graphic of the sexually explicit drawings by acknowledged masters such as Rembrandt, Picasso, Chagall, Grosz, Munch and others[3] are lacking in serious value within the meaning of Miller, supra. Although not apparent to most, to the viewer whose perceptions have been cultivated these values are clearly present.
Except for a few, most lives are passed without a meaningful exposure to the arts and sciences and without developing the slightest curiosity about them. I therefore think it approaches recklessness to allow a judge and jury to determine whether a writing or a representation lacks serious literary, artistic, scientific or political value without first insuring that they be given substantially more than a dictionary definition of what these words mean. Justice Douglas made the point well, I think, when he wrote in his concurring opinion in Memoirs v. Massachusetts, supra:
We are judges, not literary experts or historians or philosophers. We are not competent to render an independent judgment as to the worth of this or any other book, except in our capacity as private citizens. I would pair my Brother Clark on Fanny Hill with the Universalist minister I quote in the Appendix. If there is to be censorship, the wisdom of experts on such matters as literary merit and historical significance must be evaluated. [383 U.S. at 427, 86 S.Ct. at 981]
*338 In general, the use of experts in this field has been encouraged. In Smith v. California, 361 U.S. 147 at 165, 80 S.Ct. 215, at 225, 4 L.Ed.2d 205 (1959) Justice Frankfurter wrote in his concurring opinion:
* * * community standards or the psychological or physiological consequences of questioned literature can as a matter of fact hardly be established except through experts.
And in the same case, although disagreeing with the result reached, Justice Harlan conceded that "expert testimony is the most convenient and practicable method" of proving community standards. 361 U.S. at 172, 80 S.Ct. at 228. Even those decisions cited earlier in this opinion, although holding such evidence was not required, speak of its usefulness in obscenity prosecutions.
Whatever objection there may be to the required utilization of experts based on the possibility of abuse is properly the concern of the trial judge. The practice need not result, as has been suggested elsewhere, in turning the case over "`to a collection of randomly chosen Ph.D.'s'." United States v. Groner, supra at 587 (concurring opinion). In the discretion of the trial judge rests the power to determine the qualification of witnesses, their credentials, and to control the examination. Properly conducted, the problems presented by the use of expert witnesses in an obscenity trial should be no greater than those arising in other cases which require opinions on subjects outside the knowledge of ordinary laymen.
The only reservation expressed by the cases favoring the requirement of expert testimony applies to cases of "hard core" pornography. In such instances, those cases suggest, expert testimony might not be required. But drawing the line at "hard core" material still leaves the problem of definition, and in such cases I would still require expert testimony to establish its obscene character. As Justice Proctor observed in State v. Hudson County News Co., supra, 35 N.J. *339 at 254, this label "is too vague to be helpful to a court or a jury in determining whether particular material is obscene." See also Jacobellis, supra, 378 U.S. at 201, 84 S.Ct. 1676 (Warren, C.J., dissenting). One reply to this, I suppose, is that one knows such material when one sees it. Id. at 197, 84 S.Ct. 1676 (Stewart, J., concurring). But if this is so, if "hard core" is so readily identifiable, what then is the purpose of the trial? And why submit this issue to the jury at all? I have tried to point out earlier that under Miller the test is far more complicated than can be satisfied by a visceral response. Still, if I am wrong about this, even if it can be known a priori, I cannot see the harm in requiring the testimony of a witness with special insights to explain its manifestly obscene character. If its indecent properties are so obvious there should be no difficulty in having the witness testify that this is so and saying why. By so doing he would at least provide a reasoned basis in the record to support the finding of guilt and where, as here, a term of imprisonment in State Prison has been imposed this is a consummation which has much to recommend it.
For the reasons given I would reverse.
NOTES
[1] The judgment of conviction, however, omits any reference to the fine.
[2] State v. Welke, 298 Minn. 402, 216 N.W.2d 641 (Sup. Ct. 1974).
[1] Miller's holding that national standards need not be applied is apparently limited to the questions of whether the material has prurient appeal and whether it is patently offensive. 413 U.S. at 30, 93 S.Ct. 2607. It seems not to apply to the question of whether the material lacks serious literary, artistic, political or scientific value. "The Supreme Court, 1972 Term," 87 Harv. L. Rev. 1, 169, n. 58 (1973); Note, Community Standards, Class Actions and Obscenity under Miller v. California, 88 Harv. L. Rev. 1838, 1842 n. 30, 1854 (1975). It is difficult to understand what part community standards could possibly play in testing "serious value" in any case, but since Kaplan v. California, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973), holds that expert testimony is not required to prove that the material is "utterly without redeeming social importance" under the previous "Roth  Memoirs" test, Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), it is unclear by what standard courts and juries are to make their assessment of "value."
[2] Under this practice, in addition to the three cases reversed in Redrup, the court filed 31 per curiam opinions in which obscenity convictions were reversed. See Paris Adult Theatre I v. Slaton, supra, 413 U.S. at 82 n. 8, 93 S.Ct. 2628 (Brennan, J., dissenting); Note, "Community Standards. Class Actions, and Obscenity Under Miller v. California," 88 Harv. L. Rev. 1838, 1841 (1975).
[3] See, Kronhausen, Erotic Art, 95, 106, 110-113 (1968).